[No. 2258.]

## A. A. Steagald v. The State.

### On Motion to Dismiss Appeal.

1. Murder—Sentence—Final Judgment.—The State's motion to dismiss the appeal in this case assails the sufficiency of the judgment rendered by the trial court upon the verdict assessing capital punishment, in that it does not declare the mode and manner in which the death sentence shall be carried out, i. e., that the defendant "shall be hanged by the neck until dead." *Held*, that, since the adoption of the Revised Codes, it is not essential that the judgment of the trial court shall recite the mode of execution. The judgment in this case, reciting that "it is therefore considered and adjudged by the court that the defendant, A. A. Steagald, is guilty of murder in the first degree as found by the jury, and that he be punished as has been determined by the jury, that is, with death, and that he be remanded to jail to await the further order of this court herein," was sufficient, and the motion to dismiss the appeal is, therefore, overruled. See the opinion on the motion, *in extenso*.

### On the Merits.

2. Practice—Special Venire.—One of the requirements of the statute is that the clerk of the trial court from which an appeal is taken shall "prepare a transcript of all the proceedings had in the case," etc. A special venire is one of the important and peculiar features pertaining to the organization of the jury in a capital case, and the record on appeal should show all of the proceedings had in relation thereto. Though it may be inferred from the record in this case that the special venire was ordered, that fact can not be presumed by this court, for the order is one which goes to the foundation of the defendant's rights. And, though no objection to the organization of the jury was made *in limine*, this court would not, even though the proceedings were otherwise regular and sufficient, affirm the judgment unless a writ of certiorari should show the order for the special venire.

3. Arraignment—Plea.—If in a capital case the record on appeal shows that the defendant pleaded "not guilty," but is silent respecting his arraignment, this court, presuming that an arraignment was waived, will not reverse the judgment of conviction for want of an arraignment; but if the record shows neither an arraignment nor a plea, the judgment will be set aside.

4. Same—Challenge for Cause—Jury Law.—A proposed juror stated on his *voir dire* that he had formed an opinion in the case, and that it would take evidence to remove it. Being challenged for cause by the defendant, the trial court subjected him to further examination, and he

stated that his opinion .was based upon hearsay; that he did not value hearsay evidence much, and that he could render an impartial verdict upon the law as given by the court and the testimony given by the witnesses. *Held,* that, the juror being qualified, the defendant's challenge was properly overruled. Moreover, as the record fails to show that the defendant had exhausted his peremptory challenges, it fails to show that his rights were in any way prejudiced.

5. EVIDENCE—PRIVILEGED COMMUNICATIONS.—Declarations made by the defendant to or in the hearing of a physician in professional attendance upon him do not, under the statutes of this State, come within the class of privileged communications. See the statement of the case for evidence of this character *held* both pertinent and admissible.

6. SAME—PREDICATE.—As a predicate for the introduction of the written testimony of certain witnesses, taken before an examining court, the State introduced the affidavit of one M., which, in conformity with the statute, recited the fact that the said witnesses were beyond the limits of this State, having removed to the State of Tennessee. The defense disputed the truth of this recital of the affidavit, and requested the trial court to place the affiant M., who was present in the court room, upon the stand, so that he might be tested as to his means of knowledge of the allegations made in his affidavit. The trial court sustained the predicate as laid, and refused to allow the examination of M. as to his means of knowledge. *Held,* that, in the latter ruling, the court erred. See opinion *in extenso* on the question.

7. MURDER—CHARGE OF THE COURT.—The indictment in this case charged a murder by personal violence, and with malice aforethought. The trial court charged, as a part of the law of murder of the first degree, that "all murder committed by poison, starving, torture or with express malice, or committed in the perpetration or in an attempt at the perpetration of arson, rape, robbery or burglary, is murder in the first degree." *Held,* error, but immaterial error in view of the fact that the same was cured by subsequent portions of the charge—the rule being that, in testing the sufficiency of a charge of the court, it must be considered as a whole.

8. SAME.—The general charge of the court should always include the instruction that if the jury do not believe the defendant guilty they should acquit. The omission of such instruction has the tendency to impress the jury with the belief that, in the opinion of the court, the defendant was, under no circumstances, entitled to an acquittal, even if they believed him not guilty.

9. SAME.—See the statement of the case for instructions of the court, given in response to questions by the jury, *held* not to be obnoxious to the objection that they were not responsive to the issues in the case.

10. SAME—CHANGE OF VENUE—NEW TRIAL.—See the opinion, *in extenso,* for circumstances under which the trial court, in a murder case, having in the first instance erroneously declined to change the venue of its own motion, should have awarded the defendant a new trial, and note the comments of this court upon the proceedings in the lower court upon the trial of this case.

APPEAL from the District Court of Clay. Tried below before the Hon. B. F. Williams.

The indictment in this case charged the appellant with the murder of the infant —— Steagald, in Clay county, Texas, on the twentieth day of January, 1886. The effort of the State was to establish against the appellant a murder scarcely paralleled in atrocity by any recorded in the annals of crime, and unexcelled in deliberate diabolism by any yet conceived as fiction. Having established the illegitimate maternity of the deceased infant in his own unmarried daughter, the State attempted to establish, by circumstantial evidence, that the babe was the offspring of his own incestuous lust, begotten within the precincts of a place of worship, and that it was brutally murdered by him while the unfortunate victim of his unnatural passion was yet struggling to preserve the life she gave, and which her father, seducer and paramour destroyed. The jury concurred with the State in its estimate of the evidence, found the appellant guilty of murder in the first degree, and assessed the death penalty against him.

Doctor S. G. Biddick was the first witness for the State. He testified that he had been a physician for fifteen years, and that in January, 1886, he lived in Henrietta, Clay county, Texas. On the morning of January 15, 1886, the defendant came to the witness's office in Henrietta, and requested his attendance upon his (defendant's) wife, who he said was in labor. The defendant lived in Cambridge, a village situated about two miles east of Henrietta. Witness started with the defendant, and when they reached a point about a half a mile from his house the defendant stopped and told witness that he wanted to make an explanation in regard to the patient, which he hoped the witness would preserve as a professional secret. He then told the witness that the person in labor was not his wife, but a young lady of good family who had been unfortunate; that she was then staying at his house, and that her condition was unknown except to himself and one old lady, who would perish before she would betray the young lady, and that as soon as the young lady was able to travel he was going to send her off. He then asked witness if he did not think it incumbent on him as a physician to protect the secret. Witness replied to the effect that he could not see how he was going to keep the matter secret, as the child itself would be ample evidence of its birth. Defendant

replied that he did not think the child would be born alive. Recommencing their journey, defendant directed witness to drive direct to his house, while he would go by a neighbor's to leave the horse he had borrowed to ride to Henrietta after the witness. Witness drove up to defendant's house, where he met the defendant, and told him that he (witness) did not care to assume charge of the case unless the presence of one or two old ladies at the child's birth could be secured—that he did not like to have anything to do with such cases unless other persons were present. Defendant refused to tolerate the presence of any body else, protested that the young lady was suffering tortures, and insisted that witness should go in, as he believed the accouchment was even then impending. The witness declined to go in, but told defendant that he would go back to Henrietta, get Doctor Galloway and return. Defendant asked if witness thought he could get back in time, and for directions if labor culminated in his absence. Witness told him that he could get back and left.

Witness went back to Henrietta, got Doctor Galloway and returned to defendant's house. On their arrival they found a young woman lying in child birth, but the labor progressing slowly. Doctor Galloway, being somewhat unwell, returned to Henrietta, and the witness remained until the child was born, on Saturday evening, between twenty-two and twenty-four hours after he and Doctor Galloway first saw the patient. The child was born alive, and at its birth was ordinarily robust and healthy. The witness remained at the defendant's house about an hour and a half after the birth, and got home about sun down. Shortly after the child was delivered, the witness handed it to Mrs. Steagald, the wife of the defendant, and told her to take it to the stove, in the adjoining room, and wash and dress it. Mrs. Steagald took the child to the stove and was dressing it when, a few minutes later, the witness stepped into that room from the room in which the mother lay. Observing how Mrs. Steagald held the child, witness told her to turn it on its left side, so that respiration and circulation would be less difficult. Mrs. Steagald made some remark which the witness did not catch, but just at that time he saw Mrs. Acres and Mrs. Johnson's daughter approaching the house. Mrs. Steagald thereupon fled with the child into the room in which its mother lay, covered the child up, closed the door between the two rooms, and did not come back into the front room while the two ladies stayed there;

nor was the door between the two rooms opened during that time. The defendant met the ladies in the front room. They asked him how his daughter was. He replied that she was very sick—too sick to see company or to be disturbed; that they could see her if they would call within the next two or three days, and complained that he was unwell himself. The witness had no previous intimation that the young woman who had just been confined was the defendant's daughter, nor did the defendant say as much, but witness inferred the fact from the defendant's reply to the ladies. The defendant's two other daughters, the one twelve or thirteen years old and the other ten or eleven, came into the front room of the house during the visit of the two ladies. His two smaller children played outside the house pretty much throughout the day.

The witness spent all of Friday night—the night before the birth of the child—at the defendant's house. Witness went to bed in the front or sitting room, in which the stove was, but he was frequently up and awake through the night. Defendant sat up all night. His wife slept awhile early in the night. The mother of the child suffered a great deal during her labor and accouchment. The principal cause of her suffering was attributable to a derangement of her womb, which may have resulted from any one of several causes. She had contracted a violent cold and her bowels were running off copiously. The condition of the bowels was such as might have been produced by the administration of drastic purgatives, or it may have resulted from something else. It is not infrequently the case that pregnancy is accompanied by the running off of the bowels, but as a general rule the bowels, in pregnancy, are costive. If anybody administered medicine to the patient before the witness did, during that illness, witness did not know it. Her womb was contracted and the mouth turned backward, which made the labor protracted and painful. There was no fire in the room in which the patient gave birth to the child; it was freezing cold weather and witness advised the defendant to move her into the front room to the fire. On Sunday night, the night after the child's birth, the defendant came for the witness to attend the patient again, saying that she had grown worse. Witness went to defendant's house early on Monday morning and found the patient in bed in the front room, in which the fire was. Witness found at once that she was much worse; and that her pulse and temperature were about what they were at the birth of the child.

Witness administered two doses of medicine and left other doses to be given.   As he had not a sufficiency of quinine with him he told the defendant that he should procure more of the medicine, and give it according to directions.   Defendant sent his seventeen year old son to Henrietta with the witness to get it.

Seeing nothing of the child when he reached the house on Monday morning, witness asked the mother for it.   She said that she knew nothing about it.   He thereupon asked the defendant, and he said that he had given it to a countryman and his wife to raise.   There was an old lady about the defendant's house during the labor of the patient whom witness did not know, and whose name, as stated by defendant, witness did not know.   Defendant was often in the room in which the child was born during the patient's labor.   He, his wife and witness were the only persons present at the birth of the child.   The witness never saw the child, while alive, in the hands of anybody save himself and Mrs. Steagald.   The last that the witness saw of the child alive was when it was taken into the rear room, by Mrs. Steagald, placed on the patient's bed and covered up, and that was when Mrs. Acres and Miss Johnson came to the house.   It was then wrapped in a piece of an old quilt and had not then been dressed.   The child was then alive, perfectly developed, and had no bruises about its body.   The defendant's son, about seventeen years old, was about the defendant's house, but not in the sick room on the day before, nor on the day of the child's birth.   He and his elder sister went to a party in Cambridge on Friday night, and did not return until the next morning.   Each of them seemed to know that their sister was sick, but did not appear to know the nature of her illness. When, shortly after the child's birth, Mrs. Steagald saw Mrs. Acres and Miss Johnson approaching the house, and just before she fled into the sick room with the child, Mrs. Steagald said to her husband: "I don't see how in the world we are going to keep this affair secret.   We might as well tell it to everybody; so many people keep coming in."   Defendant replied: "Oh, no, we can keep it secret.   I will send the mother and child off in two or three days."   Witness interposed the objection to this proposition that the mother could not be moved in that time. No apparent effort was made to prevent the witness, who was present, from hearing this conversation.   (It was to this evidence that the objection considered in the fifth head note of this report was taken.)   If Mrs. Steagald ever said any thing about

the child having spasms in the witness's presence, the witness did not hear her. The witness has been informed that the young woman of whom he delivered the child was the defendant's daughter, Mollie Steagald.

The child born to Mollie Steagald on Sunday evening, January 16, 1886, is dead. The witness saw its dead body on the Thursday or Friday after its birth. Doctor Ferris brought the body to the witness's house. The witness was then sick in bed. Witness examined it only enough to identify it as the child born to Mollie Steagald on the preceding Saturday evening. Witness identified the tying of the navel cord as his work, and recognized the body by the features. Witness did not touch the body with his hands. Doctor Ferris raised the head and suffered it to drop. It was the witness's opinion that the child's neck was broken. He was not certain of that fact, as he made no close examination. The witness did not know that the child's arm was fractured, nor that its skull was crushed. On Friday night, before the child's birth, the witness and defendant, sitting alone in the front room, dropped into a conversation about the pregnancy of women, in the course of which the defendant remarked: "Is it not strange, Doctor, that medicine can be given to a pregnant woman that will destroy the fœtus without injuring the woman?" The witness replied that he was not aware that it could be done. Defendant did not intimate that he had given his daughter medicine to produce an abortion, nor did he know that any medicine had been given by any body to produce abortion on Mollie Steagald. Defendant did not tell the witness on Monday the name of the persons to whom he claimed to have given the child, nor did witness ask him. The child was a female child, in good robust health, and well developed physically when witness last saw it alive, a short time after its birth. While witness was at defendant's house during Mollie's labor, the defendant appeared anxious to keep her condition secret, and met all visitors himself and turned them away.

George Norton was the next witness for the State. He testified that, on or about January 20, 1886, he found the dead body of an infant in the garret of the defendant's house in Cambridge, Texas. It was in a small box, wrapped in a piece of an old quilt. The witness was then officiating as a member of the coroner's jury, holding an inquest upon the dead body of Mollie Steagald, the daughter of the defendant. At the conclusion of the inquest upon Mollie Steagald's body, the jury and others pro-

ceeded to search the defendant's premises for a child or its remains. Stepping into the east room of the defendant's house, the witness discovered a hole, about two feet square, cut into the ceiling, over which a sack was nailed. Witness got into the garret through the hole, found the box containing the body, and handed it down, box and all, without disturbing the quilt or the remains. He did not handle the corpse in such a manner that he could possibly have bruised it in any way. The body of the child was taken out of doors, and an inquest was held on it. Witness saw the body after it was taken out of the box. One of the arms was broken. Its head appeared to have been pressed flat, so as to make it bulge at each temple. He saw Doctor Ferris, who was in attendance upon the inquest, move the head about, and he became satisfied that the neck was broken. Witness could not tell how long the child had been dead, but did not think it could have been long. The body was wrapped in a piece of old quilt, and had a piece of domestic around it. The body was given to some ladies to be washed and dressed, and was then taken to Henrietta. The defendant was not at home at the time of the inquests and the discovery of the child's body. It was the understanding of the witness that the defendant was then under arrest.

Doctor J. H. Ferris testified, for the State, that he was called to defendant's house in Cambridge, Clay county, Texas, on or about January 20, 1886, to attend his daughter Mollie, then sick. Witness reached the house of the defendant about twelve o'clock, examined the defendant's daughter Mollie, calculated that she could not survive, and so informed the defendant, adding that he expected her to die before night. The witness gave the patient one dose of medicine, left others with the defendant to be administered, and directed defendant to report her condition at the end of two or three hours. Some of the neighborhood ladies were present when the witness was at defendant's house. Witness did not know the condition of Mollie's bowels at the time. As a rule, the bowels of pregnant women are costive, but they sometimes become diarrhetic. Drastic purgatives will sometimes produce abortion. The witness was unable to say whether or not Mollie had taken any such purgatives. The witness had an idea of the nature of Mollie's sickness when he went to see her, but said nothing to defendant about it. Witness remained at the defendant's house but a short time on that visit.

Witness went back to the defendant's house on the evening of the next day. Mollie was then dead. Witness could not say what caused her death. Drastic purgatives, though they sometimes produced abortion on pregnant women, are sometimes given in pregnancy to relieve costiveness. Witness examined the body of defendant's daughter Mollie, and also the body of an infant which was found in the garret of defendant's house by George Norton. The witness did not know of his own knowledge who was the mother of the dead child. Witness was ordered by the coroner to examine the body, and did so. He could not tell exactly how long the child had been dead, but it could not have been many days. It was the body of a newly born female child, not exceeding two days of age at the time of its death. Witness thought that the right arm was fractured between the elbow and shoulder. The arm appeared to be bruised. The neck was dislocated and the back of the skull was fractured. Witness did not make a surgical examination of the body. All three of the apparent fractures had the signs of fractures. The first sign of fracture is crepitation and grating. The second sign is the increased mobility of the part. The third is the deformity and unnatural appearance of the part. The grating sign would doubtless be more discernable in the fracture of the limb of an adult than in that of a child, but the other signs would be as perceptible in an infant as in an adult. The witness did not know what made those apparent fractures, but they could not have been so readily or so easily made after as before the death of the child. The apparent fractures on the back part of the skull seemed to be of about half the size of a boot heel. Those fractures could have been made by a man, if he first placed the child face down on the floor, then placed his boot heel on the head, and then twisted and turned the arm about, and that, in the witness's opinion, was the easiest manner in which it could have been done; and witness thought, from the condition of the wound, that death was inflicted in that manner. One of the witness's reasons for thinking that the wounds were inflicted before death was the discoloration of the broken arm. It was very much discolored, and the blood had coagulated about the fracture, indicating that the fracture preceded death. Witness did not know what caused the fractures on the child's body. If they were inflicted before death, witness thought they caused death. About one per cent only of children are still born.

Mrs. Mollie A. McKinney testified, for the State, that she was

at the defendant's house in Cambridge on or about January 20, 1886, when defendant's daughter Mollie died. The defendant was present and appeared anxious to do personally most that was necessary to be done for Mollie pending her death struggle. He appeared to think a very great deal of his daughter Mollie. Witness was at defendant's house again on the next day and saw the body of an infant said to be Mollie Steagald's. The infant had not been washed nor dressed since its birth. It had a piece of old quilt around it. Witness helped to wash and dress the body, after which it was turned over to gentlemen who took it to Henrietta. It was brought thence on the next day and buried with its reputed mother. Its head was crushed and broken in—a fact which the witness discovered by feeling it. Defendant appeared to be very much attached to his daughter Mollie, who was a girl well thought of by everybody in the neighborhood. She was about nineteen years old and had no male intimates outside of her family. She was waited upon by no young man and was always accompanied to parties or entertainments either by the defendant or her sisters.

A. H. Pogue testified, for the State, that he and the defendant both lived in Cambridge in the year 1884. In the summer of that year the defendant came to the witness, who had the care and custody of the Presbyterian church in the said town, and told witness that he had no organ of his own and was anxious for his daughter to keep up her practice on that instrument, and asked witness if he could secure permission for her to go into the church and practice, agreeing to pay a reasonable compensation for the use of the instrument. He remarked in the same connection that he cared nothing for music himself, but that his daughter did. Witness told defendant that he was not authorized to rent the organ, but that, as they were neighbors and friends, he would permit defendant's two oldest daughters to go into the church whenever they pleased and use the organ if they would promise to keep the door closed, and keep children out while there. Defendant promised that he would see that witness's wishes in that regard were complied with. Defendant's daughter Mollie practiced on the organ in the church off and on until July 2, 1885. Sometimes she was accompanied to the church by her next sister and sometimes by the defendant. Witness had seen the defendant go with her into the church as often as half a dozen times. The church door was always closed after them. Defendant would sometimes remain in the church

thirty minutes and sometimes one or two hours. While defendant and Mollie were in the church the organ would play awhile, stop awhile and then re-commence. In going to the church from their house the Steagalds would pass witness's house and get the key. Toward the last, however, they got a key of their own and went into the church whenever they pleased. Witness did not like the procurement of a duplicate key and had a new and different style of lock put on the door. When Mollie discovered the new lock she quit going to the church. Mollie Steagald had no male friends or beaux. She attended parties with members of her family only. Mrs. Pogue testified substantially as did her husband, and added that she had understood that defendant had forbidden his daughter Mollie to receive the attention or gallantries of gentlemen. Mrs. Buckles corroborated Mr. and Mrs. Pogue.

W. W. Bell testified, for the State, that he was a member of the grand jury which preferred the indictment in this case. That grand jury had no evidence before them other than the finding of the coroner's inquest and the record of the testimony taken at the inquest. They made no effort to secure other testimony. They did not know the name of the alleged murdered infant, nor did they try to ascertain it.

J. M. Jones, another member of the grand jury, testified, for the State, substantially as did the witness Bell, and in addition, that he and other members of the grand jury knew that Mrs. Steagald, John, Emma and Fannie Steagald, the defendant's wife and children, had left Texas and removed to the State of Tennessee. They knew that much from the fact that they left Clay county to go to Tennessee, and parties in the neighborhood had received letters from them since their arrival in Tennessee.

Doctor F. O. Galloway was the next witness for the State. He testified that he lived in Henrietta, Clay county, Texas. On or about January 10, 1886, the defendant came to and told witness that his wife was *enciente* but not yet in labor; that he wanted witness to attend her in her confinement; that she was then suffering from pains, and that he wanted some medicine to relieve her. Witness prescribed, and defendant left. On or about the fifteenth of the same month defendant returned to witness, reported his wife in labor, and wanted witness to attend her. Witness replied that he was sick, and advised him to get Doctor Biddick. About midnight on the same night Doctor Biddick came to witness's house to get him to go to defendant's house.

Witness and Doctor Biddick went together, and on their arrival found a young woman in child bed, the labor progressing slowly. Witness did not remain long at the defendant's house on that occasion, nor did he go back again. Children are sometimes still born, but the percentage is very small. Pregnant women frequently suffer from diarrhetic bowels. Drastic purgatives, and other drugs will produce abortion. The witness could not say that the patient had been taking medicine when he saw her, but he became satisfied, from the condition of her womb and the position of the child, that her delivery was going to be difficult.

Doctor Tom McGee testified, for the State, that the fracture of a bone in the human frame, if made before death, will produce much more of discoloration than if it was made after death. If the fracture is made just after death discoloration to some extent will form about the fracture. The percentage of children still born is very small, not exceeding one per cent. Drastic purgatives and many other drugs will produce abortion upon a pregnant woman. A woman is as liable to contract diarrhœa and other ailments during pregnancy as at any other time.

The State next introduced in evidence the record of the proceedings of the examining trial, and read therefrom the written testimony of John, Emma and Fannie Steagald, the son and daughters of the defendant. John Steagald's testimony was to the effect that he saw a dead infant at the defendant's house about a week before the examining trial. He did not know who was the mother of that infant, but had been told that his unmarried sister Mollie was. With one exception, and that Friday night, the witness slept at home every night for a week before he saw the dead infant. He slept at home on the Saturday following the said Friday night, but could not remember the hour he went to bed. Mollie was then sick and had been sick for several days. Witness went to Henrietta for Doctor Ferris on the day that Mollie died. His father, the defendant, sent him.

The material part of Emma Steagald's statement was to the effect that she saw the dead body of an infant at the defendant's house on the day before her sister Mollie was buried. That infant was the daughter of Mollie Steagald. It was found in the garret of defendant's house. The hole leading to the garret was some times covered over with a coffee sack, but witness never saw it covered tightly before the day on which the body

was found. On the morning of that day defendant told witness and the other children not to go into the garret, giving as a reason that the constant removal of the sack admitted too much cold. He had often before told witness and her brother and sister to place the sack carefully over the hole in going up and down, in order to keep the cold out. Fannie Steagald's statement was, in substance, the same as that of her sister Emma.

Ben F. Turner testified that the examining trial of the defendant was held before him, then a justice of the peace. Defendant was present, but was not represented by counsel. Witness neither appointed counsel to represent the defendant nor did he ask defendant if he wanted counsel.

The ninth head note of this report announces the ruling of this court upon the charges of the trial court, in response to certain interrogatories propounded by the jury. The questions were as follows:

" 1.   Is the defendant, in such a case as this, allowed to testify or to make a statement?

" 2.   If so, did Steagald testify or make a statement upon any previous examination?

" 3.   If some other person than Steagald killed the child, with his knowledge and consent, would the defendant be guilty of murder in the first degree? "

The trial court replied as follows:

" The court instructs the jury:  1.   That the defendant in this case could not, on the trial in this court, testify or make any statement whatever.

" 2.   That he would not be permitted to testify as a witness in such cases as this in any court.

" 3.   That the second question propounded by the jury is one which it is not the duty or province of this court to answer, and is not in issue in this case.

" 4.   In response to the third question propounded by the jury, the court instructs the jury as follows, to wit :

" ' All persons are principals who are guilty of acting together in the commission of an offense.'

" 2.   When an offense is actually committed by one or more persons, but others are present, and, knowing the unlawful intent, aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act, or who, not being actually present, keep watch so as to prevent the in-

terruption of those engaged in committing the offense, such persons so aiding, encouraging or keeping watch, are principal offenders, and may be prosecuted and convicted as such.

" 2. That if the jury find from the evidence that some person other than the defendant killed the deceased, and that such killing was upon express malice aforethought, and with sedate and deliberate mind and formed design, and that such other person would, under the law heretofore given you and defined in charge, be guilty of murder in the first degree; and if you further find, from the evidence, beyond a reasonable doubt, that the defendant was present at the time of the homicide, and knew of the unlawful and malicious intent of the person or persons committing the same, aided by acts or encouraged by words or gestures such other persons in the commission of the homicide; or that, if the defendant was not actually present, yet that he, knowing of the unlawful and malicious intent of such person or persons actually committing the offense, kept watch so as to prevent the interruption of such person or persons so engaged in the commission, then if you should from the evidence so believe and find, under the law as herein before given you in charge by the court, beyond a reasonable doubt, you shall find the defendant guilty of murder in the first degree; otherwise you shall find him not guilty, unless you should find him guilty under the charge heretofore given you by the court."

The opinion discloses the material allegations of the motion for new trial.

*W. G. Eustis, A. M. Jackson, Jr.,* and *N. P. Jackson,* for the appellant. The record in capital cases should affirmatively show that all of the proceedings incident to the organization of the jury were observed in the trial court. Especially should it show that a special venire was ordered, summoned and drawn according to law. (Code Crim. Proc., Arts. 606–610.; Handline's case, 6 Texas Ct. App., 347; Smith's case, 21 Texas Ct. App., 277.)

Except by formal recital in the judgment, the record fails to show the arraignment or plea of the defendant. (Stacey's case, 3 Texas Ct. App., 303.)

The proposed juror Saunders disqualified himself on his *voir dire.* He declared that evidence would be required to change the opinion he had already formed of the defendant's guilt, and upon his further examination after challenge for cause, he qualified his first statement by declaring that his opinion was based

on hearsay, which he valued but little, and that he could render an impartial verdict upon the law received from the court and the testimony of the witnesses.

The written testimony of the State's witnesses, John, Emma and Fannie Steagald, taken before the examining court, was admitted upon an insufficient predicate. Before such evidence can be admitted in trials of this character, it devolves upon the State to lay a perfect predicate, such as is provided by the Code of Criminal Procedure, Articles 772, 773. One Jones, a member of the grand jury who preferred the indictment against this appellant, was placed upon the stand to locate the present whereabouts of the alleged absent witnesses. The substance of his testimony was that no witnesses were examined by the grand jury; that the indictment was based upon the record of proceedings of the coroner's inquest upon the dead body of the deceased, and upon the written testimony taken on the examining trial; that he and other members of the grand jury then knew that John, Emma and Fannie Steagald had removed to the State of Tennessee; that such knowledge was based upon the fact that they left Clay county to go to the State of Tennessee, and parties in Clay county had since received letters from them in Tennessee. The showing was insufficient. It shows only that the parties left Clay county to "go to Tennessee," and that letters from them had been received in the neighborhood after their arrival. It fails to show whether, in going to Tennessee, the parties *removed* permanently or went on a visit. It fails to show when they went to Tennessee, and to disclose when or by whom the letters from them were received. It fails to show that, *at the time of this trial*, the said witnesses were beyond the jurisdiction of the trial court, and shows no more (and that by hearsay and inference only) than that, at the time the witness and other members of the grand jury were deliberating in the grand jury room and preparing the indictment, the said witnesses were known to be in Tennessee, *from the fact that they left to go to Tennessee, and that letters had been received from them "after they got there."* Nothing is shown sufficient to negative the idea that, though the witnesses may have gone to Tennessee subsequent to the examining trial at which they testified (which was had late in January), and may have been in Tennessee when the indictment was presented on the sixteenth day of March, yet that they may have returned and been personally present in Clay county on the thirtieth day of March, when this

trial was had. In short, if the testimony of this witness establishes anything at all, it establishes the absence of the witnesses at the time that the indictment was found, *two weeks before the trial,* and, failing to allege a *permanent* removal, was insufficient to locate the whereabouts of the witnesses at the time of the trial.

In as much as a proper and sufficient predicate is made by the code an. absolute prerequisite to the admission of such testimony—the proceeding which, "going befoi e," is necessary to impart to the testimony its competency—it is to be assumed that the evidence was admitted upon the testimony of the witness Jones. But the record brings up two affidavits, signed by one E. B. Mundy, reciting that the absent witnesses were beyond the jurisdiction of the State of Texas, and residents of the State of Tennessee. Those affidavits were filed on the twenty-seventh day of March. Waiving all *pro forma* objections to the said affidavits, and conceding, for the sake of argument, that they are framed in substantial compliance with the statute, we submit that, for one reason, they can not be considered by this court, and, for another reason, were erroneously sustained by the trial court as a predicate for the introduction of the written testimony of the alleged absent witnesses.

The statement of facts in this case concludes on page 53 of the record. The trial judge's certificate authenticating the statement of facts appears on the same page. The charge of the court, the charges requested and refused, the bills of exception, the motion for new trial and order thereon, follow the statement of facts in regular order until the ninety-fifth page of the record is reached, whereon the first of the affidavits referred to is set out, followed by the second, which concludes on page 98. The assignment of errors and certificate of the clerk complete the transcript. This court, in Wade's case, decided at the present term (ante, page 256), held, in substance, that the facts proved upon a trial, so far as this court can ascertain them, are such as are contained in the statement of facts *signed* by the trial judge. Construing the word "sign," as used in this connection, this court *held* that it means the subscribing, or the writing by the trial judge of his name at the *conclusion or the end* of the statement of facts. The Mundy affidavits, under the ruling in Wade's case, are no part of the facts proved in this case. The trial judge certifies, over his signature, that the transcript, from page 5 to page 53, inclusive, contains a full and

true statement of *all* the facts proved upon the trial of this defendant, or, rather, he approves the written agreement of the opposing counsel to that effect. Was it essential to the competency of the written testimony of the absent witnesses that the State should first lay the predicate for its introduction by showing, in the manner prescribed by the code, that they were beyond the jurisdiction of the State, or resided in another State ? If so, was that proof made by the affidavits of Mundy ? The manifest answer to this last question must be an emphatic negative, in view of the fact that the statement of facts, approved by the trial judge over his sign manual, recites that the said statement of facts, so signed by him, which does not incorporate the affidavits, contains a "full and true statement of *all* the facts proved on this trial." We submit that, with respect to these affidavits, the testimony of the Steagald children was admitted without a predicate therefor.

When the State offered to read in evidence the written testimony of the Steagald children the defendant asked permission of the court to call E. B. Mundy to the stand, for the purpose of proving by him that he had not sufficient personal knowledge of the facts stated in his affidavits. and that the alleged absent witnesses were not beyond the jurisdiction of the court, so far as known to the affiant, the defendant's counsel stating at the time that the said witnesses were not beyond the jurisdiction of the court, and that Mr. Mundy did not know the facts stated in his affidavits to be true. The trial court refused the request of the defendant. In this action we contend that the trial court committed fatal error. (6 Texas Ct. App., 319 to 343; 7 Texas Ct. App., 194. Upon the whole question of the admissibility of the impugned testimony see 44 Texas, 116; 4 Texas Ct. App., 433; Id., 186; 2 Texas Ct. App., 169.)

The third paragraph of the charge (referred to in the seventh head note), is a pernicious abstraction, and in this case improper and misleading. There is no evidence whatever in this this case even *tending* to the establishment of any of the matters of exemplification, submitted to the jury by this charge, and their submission was well calculated to impress the jury with the belief that they might in this case infer the existence of some one or more of the matters exemplified. (6 Texas Ct. App., 255; 13 Texas Ct. App., 414.)

The jury are nowhere informed that the defendant had pleaded "not guilty." There is no sufficient charge on the pre-

sumption of innocence, or on the doctrine of reasonable doubt, and under no circumstances are the jury instructed to acquit, or advised that they could or would be authorized to return a verdict of "not guilty."

Confident that we are "strong in reason," but diffident because it is hoary with age, and has received the sanction of a no less eminent authority than the Court of Appeals of Texas, we venture to assail the correctness of the trial court's charge upon the law of circumstantial evidence. The charge in this case reads as follows: "In order to warrant a conviction for crime on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt. All the facts (that is, the necessary facts to warrant conviction) must be consistent with each other, and with the main fact sought to be proved. The circumstances taken together must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no other person, committed the offense charged."

We *earnestly* insist that, at least in one respect, this charge is vicious, and *in its application to the case at bar* is radically wrong, and prejudicial to the rights of the accused. It *assumes* that the crime had been committed; i. e., that the infant had come to a violent death, *an assumption not warranted by the evidence in this case.* That was one of the primary *facts* to be found by the jury, and its assumption by the court was error.

This charge, it seems to us, is utterly subversive of the doctrine of reasonable doubt. The first part of the charge wherein the jury are instructed that, in order to warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt, and that all the facts (that is, the necessary facts to warrant conviction) must be consistent with each other, and with the main facts sought to be proved, is correct. The charge then proceeds: "The circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the accused, and no other person, committed the offense charged."

The vice of this part of the charge is that it substitutes "reasonable and moral certainty" for that degree of certainty which excludes all reasonable doubt. Absolute certainty is not

required, but the law does require that the evidence, as a whole, shall produce that degree of certainty which excludes every reasonable hypothesis other than the guilt of the accused. "Moral certainty" is, to the average mind, an indefinite expression. Reasonable certainty, and reasonable doubt, are different things, and they may coexist in the mind. Reasonable certainty may be defined to be that degree of certainty upon which an ordinarily prudent man would act in reference to the ordinary affairs of life; or, to borrow an expression of law usually applied to certainty in pleadings, it is "certainty to a common intent." The degree of certainty which the law requires in order to warrant conviction, is that degree of certainty which, excluding probabilities, makes evident the guilt of the accused. It is certainty to a certain intent in every particular.

In cases depending on circumstantial evidence it is not enough that each link in the chain of circumstances should be proved "beyond reasonable doubt," and that they should be consistent with each other, and with the main fact, in order to justify conviction, but, taken as a whole, the evidence must show guilt, not to a "reasonable certainty," but beyond "reasonable doubt." The presumption of innocence attends a defendant throughout trial, and the law, as a "doubting Thomas," should sit enthroned on the juror's mind until banished by the conclusive effect of testimony.

Direct evidence, to support a conviction, must, under the law, establish the guilt of the accused beyond a reasonable doubt. If the doctrine announced in this charge is correct, the reasonable doubt applies only partially to cases of circumstantial evidence; it applies, under the charge, to every issue in the case, except the main issue, that "the accused and no other person committed the offense charged," and it is sufficient, if, upon the whole, that fact is established to a reasonable and moral certainty. Such we do not believe is the law.

These criticisms of the charge are not, as applied to this case, abstractions. If illustration is needed to enforce these objections, we find it in the fact that the next day after this charge was given and the case turned over to the jury, they returned into court and asked this question: "Is a defendant, in such cases as this, allowed to testify or make a statement?" Why this question? Evidently because the jury were not satisfied as to Steagald's guilt. Even under the "reasonable certainty" doctrine, there was doubt in their minds, and they wanted to hear

from Steagald. The jury also asked this further question: "If some other person than Steagald killed the child with his knowledge and consent, would the defendant be guilty of murder in the first degree?" Here is developed a theory upon which the defendant should have been acquitted, and doubtless would have been under a fair charge. We are aware that this charge is in the common form, and has heretofore been passed on and approved by this court, but in none of the cases coming before this court has the question stood nakedly on this charge, unqualified, and unaccompanied by any other or further charge expounding the law of reasonable doubt, and the presumption of innocence. With such further charges, the one under consideration might be, and probably is a proper exemplification of the law; without them it is manifest error, both of omission and commission.

The ninth assignment of error complains of the charge of the court given in response to the questions propounded by the jury. The fifth paragraph of said charge, purporting to be in response to the third question asked by the jury, is especially objected to. First, it is not responsive to the question asked. Second, it is well calculated to make the jury believe that the defendant would be guilty of murder in the first degree, if some other person killed the infant with his knowledge and consent, which is not the law. (6 Texas Ct. App., 265; 13 Texas Ct. App., 414.)

Third, it is an abstraction as to this case, besides being erroneous within itself, for it submits to the jury issues concerning which there is not one scintilla of evidence in the record, and authorizes a conviction on these issues. This was manifest error. The charges taken as a whole, and concisely expressed, simply amount to this: Gentlemen of the jury, convict this man of murder in the first degree. (6 and 13 Texas Ct. App., supra.)

We submit to this court that the evidence is wholly insufficient to support the conviction, and that it wholly fails to establish the *corpus delicti*, proving only the one element, viz, that the child is dead. (12 Texas Ct. App., 291; 20 Texas Ct. App., 545.) Not a single witness pretends to avow the manner of the child's death, and not one undertakes to swear positively that the wounds found on the body were inflicted before death, or that death ensued from violence. Admitting, for the argument, that the *corpus delicti* was proved; that the child was absolutely murdered; there is no more evidence inculpating the defendant

than there is inculpating the counsel now addressing this court, or his honor who tried the case; and it is no more calculated to throw suspicion upon the defendant as the perpetrator of so horrible and revolting a butchery, than it is calculated to enmesh in suspicion the strange woman who was present at the birth, but not at the burial, or the wife, or the son, or the surviving daughters of the defendant.

We submit, in conclusion, that the trial judge, vigilant as we know him to be, to preserve the balance equally between the State and unfortunates tried before him, was derelict in his duty in failing and refusing to change the venue of his own motion. It is true that no statutory application for such change was filed, an omission on the defendant's part explained by the fact that Judge Lynch proclaimed from the house tops that if the venue was changed he would preside himself over the new forum and would suffer the defendant to plead only from the end of a halter. We do not propose to review the grounds upon which the new trial was applied for. The motion is pregnant with gross, but doubtless unconscious, outrage upon the judicial discretion, and speaks for itself. We do not deny that the trial judge, in ordinary cases, if he discovers no good reason why he should change the venue of his own motion, should refuse to entertain a request to do it unless it is predicated upon a proper affidavit; but we insist that, when under circumstances such as are disclosed by the motion for new trial in this case, it is made to appear to him that the mob surging around the court house, having hanged the defendant once, was proclaiming, under the very eaves of the court house, that unless tried and convicted, then and there, they would hang him again from the very windows of the court house, the trial judge should have changed the venue, instead of forcing the defendant to accept and to seek his own conviction, in order to escape the fury of the enraged populace.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.—A motion is made by the Assistant Attorney General to dismiss the appeal in this case, because "there is no such final judgment in the record as will support an appeal."

Appellant was found guilty of murder of the first degree, his punishment being assessed at death. As set forth in the record,

the judgment rendered by the court is in the following words, viz:

" THE STATE OF TEXAS
*v.*
"A. A. STEAGALD.

" Tuesday, the thirtieth day of March, 1886.

" This day this cause was called for trial, and the State appeared by her district attorney, and the defendant, A. A. Steagald, appeared in person, in open court, his counsel also being present; and the said defendant, A. A. Steagald, having been duly arraigned, and having pleaded not guilty to the indictment herein, both parties announced ready for trial, and thereupon a jury, to wit: M. E. Ivie and eleven others were duly selected, empaneled and sworn, who, having heard the indictment read, and the defendant's plea of not guilty thereto; and having heard the evidence submitted, and having been duly charged by the court, retired in charge of the proper officer to consider of their verdict, and afterwards were brought into open court by the proper officer, the defendant and his counsel being present, and in due form of law returned into open court the following verdict, which was received by the court and is here now entered upon the minutes of the court, to wit: ' We, the jury, find the defendant, A. A. Steagald, guilty of murder in the first degree, and assess his punishment at death. M. E. Ivie, foreman.' It is therefore considered and adjudged by the court that the defendant, A. A. Steagald, is guilty of murder in the first degree, as found by the jury, and that he be punished as has been determined by the jury, that is, with death, and that he be remanded to jail to await the further order of this court herein."

The objection to the sufficiency of this judgment is that it does not declare the mode and manner in and by which defendant shall be put to death—that is, that he shall "be hanged by the neck until he is dead." Before the adoption of our present Revised Penal Code, and Code of Criminal Procedure, in 1879, it was essential to the validity of a final judgment inflicting the death penalty in a murder case that it should adjudge that the defendant should be condemned to be hanged by the neck until he is dead. (Shultz v. The State, 13 Texas, 401; Burrell v. The State, 16 Texas, 147; Calvin v. The State, 23 Texas, 578; Trimble v. The State, 2 Texas Ct. App., 303.)

Article 791 of the Revised Code of Criminal Procedure defines

a final judgment, and sets forth what it must contain. When we apply its provisions to the judgment in this case we find the judgment conforms strictly to said provisions, and is, moreover, in literal compliance with the approved form set out in Willson's Criminal Forms. (No. 748, pp. 356, 357.) The declaration of the mode and manner of executing the death penalty, under our present statutes, properly belongs to and should be embraced in the sentence of the court. "A sentence is the order of the court made in presence of the defendant, and entered of record, pronouncing the judgment, and ordering the same to be carried into execution in the manner prescribed by law." (Code Crim. Proc., Art. 792.) And Article 827 of the Code of Criminal Procedure declares that "the sentence of death shall be executed by hanging the convict by the neck until he is dead." (See also Penal Code, Arts. 70 and 71.)

We are of opinion that the judgment here presented is a valid and sufficient final judgment for murder of the first degree, inflicting the death penalty, and that the motion of the assistant attorney general to dismiss the appeal is not maintainable under our present statutes. Wherefore the motion is overruled.

*Motion to dismiss the appeal overruled.*

[NOTE.—The foregoing opinion on the State's motion to dismiss the appeal was rendered on the fifth day of June, 1886, at the Austin term of the court. Subsequently the case was submitted on its merits, by both parties, was taken under advisement by the court, and transferred to the Tyler branch, and there decided the opinion on the merits following.]

WHITE, PRESIDING JUDGE. This appeal is from a conviction for murder of the first degree with death penalty, and the deceased is alleged to have been appellant's own child, and the illegitimate offspring of incestuous intercourse with his own daughter.

1. It is objected to the record sent up on this appeal that it does not affirmatively show that any *special venire* had ever been ordered, drawn, and summoned as required by law, before the trial in the lower court. (Code Crim. Proc., Arts. 606, 607, 608, 610.) "It is the duty of the clerk of a court from which an appeal is taken to prepare, as soon as practicable, a transcript in every case in which an appeal has been taken, which transcript shall contain *all the proceedings* had in the case," etc.

(Code Crim. Proc., Art. 860.) A special venire is one of the important and peculiar features pertaining to the selection of a jury for the trial of a capital case, and the record on appeal should show the proceedings with regard thereto. From other portions of the record we infer a special venire was ordered in the case. But such matters should not be left to inference, and where the statute makes it the duty of the clerk to send up all the proceedings, he should do so or be able to show a reason for not doing so—as that the incorporation of the same into the record was waived by the appellant. Where mere irregularities occur in a transcript this court may overlook or presume that that was done which should have been done (Smith v. The State, 21 Texas Ct. App., 277; Handline v. The State, 6 Texas Ct. App., 347); but such presumption can not and will not be indulged where the proceeding goes to the very gist of one of a defendant's most important rights, given him by law when about to be tried upon a matter involving his life. No objection, however, appears to have been taken *in limine* to any matter pertaining to the *special venire*, and doubtless the provisions of the law were fully complied with. The transcript not showing this matter, if we had concluded to affirm the judgment otherwise, we would not do so until we had first ascertained, by means of a *certiorari* to perfect the record, that the proceedings not shown had been taken in conformity with the statute.

2. It is complained that the record does not show that defendant was ever arraigned under the indictment and required to plead thereto, except by the formal recitals in the judgment; which, it is claimed, is insufficient. This question was sufficiently discussed, and the authorities cited in Wilson's case. (17 Texas Ct. App., 526.) Whilst the practice contemplated by the statute (Code Crim. Proc., Arts. 508, 509) would seem to indicate the procedure as a separate one preliminary to the trial proper (Smith v. The State, 1 Texas Ct. App., 408), yet the more common practice is, we believe, to arraign the defendant when he is called to plead to the indictment at the trial; and that is certainly sufficient under the comprehensive rule, now well settled, that "if the record shows that the accused pleaded 'not guilty,' but is silent respecting the arraignment, this court, presuming that an arraignment was waived, will not reverse the judgment of conviction for want of an arraignment; but, if the record shows neither an arraignment nor a plea, the judgment

would be set aside." (Plasters v. The State, 1 Texas Ct. App., 673; Wilson's case, *supra*.)

3. Appellant's first bill of exceptions was as to the ruling of the court in holding the juror Sanders competent on the examination on his *voir dire*. Sanders did not show himself incompetent or disqualified. (Thompson v. The State, 19 Texas Ct. App., 594; Kennedy v. The State, Id., 619; Johnson v. The State, 21 Texas Ct. App., 368.) Moreover, it is not shown by the bill that defendant had exhausted his peremptory challenges, and unless that is shown he has no right to complain. (Loggins v. The State, 12 Texas Ct. App., 65; Bean v. The State, 17 Texas Ct. App., 60; Heskew v. The State, 17 Texas Ct. App., 161.)

4. Appellant's second bill of exceptions was as to the admissibility of Doctor Biddick's testimony of a conversation which he overheard between the defendant and his wife, whilst the witness was attending the mother of the child as physician, during her confinement. "A medical attendant is ordinarily without privilege even as to communications confidentially made to him by his patient. In the United States, however, statutes in several jurisdictions have been passed conferring this immunity, which statutes virtually prohibited physicians from disclosing information they derive professionally from their relations to their patient." (Whart. Crim. Ev., 8 ed., sec. 516.) We have no such statute in this State. That the testimony was relevant and pertinent there can be no doubt, because it went to establish a design and intent on the part of the accused, and to show his anxiety and determination to dispose of the child by sending it and its mother away, and thus keep secret the disgrace which had befallen his family.

5. A most serious question is raised by appellant's third bill of exceptions. It appears that on the day on which the examining trial was had, John, Fannie and Emma Steagald, minors and children of defendant, were summoned to testify, and did testify at said trial, to certain facts of a damaging character against defendant. As a predicate for the introduction upon the trial below in this case of the written testimony of said witnesses, taken as aforesaid at the examining trial, one E. B. Mundy made an affidavit relating the circumstances of their testifying at the examining trial; and he deposed furthermore in said affidavit that the said witnesses, John, Emma and Fannie Steagald, since the taking of said testimony, have removed from the State of Texas and from the jurisdiction of this court, and

taken up their permanent residence in the State of Tennessee; and the said E. B. Mundy, in another and second affidavit, states that said parties are material witnesses for the State in this cause, and that they reside out of the jurisdiction of the court and in the State of Tennessee. Upon this predicate the prosecution proposed to introduce in evidence the written testimony of the witnesses taken at the examining trial. Defendant's counsel objected, and asked the court to have the affiant Mundy, who was there present in the court room, sworn and tested under direction of the court as to his knowledge and means of knowledge of the facts stated by him, to wit, that the said witnesses had removed from the State of Texas to the State of Tennessee, and were beyond the jurisdiction of the court,—defendant at the time stating that said witnesses were not beyond the court's jurisdiction, and that affiant Mundy did not know the facts as stated by him in his affidavit. The court refused to have affiant Mundy called, sworn and tested as to his means of knowledge, overruled defendant's objections to the evidence, and permitted the introduction of the same before the jury. There is no question but that the affidavits in their allegations were in conformity with the requirements of the statute (Code Crim. Proc., Arts. 772, 773), and established a sufficient predicate for the introduction of the testimony, provided the affiant Mundy was a "credible person" and knew the facts deposed to. Article 773 declares that when such testimony is proposed to be used by the State, *the oath* prescribed may be made by the district or county attorney, "or any other credible person." No provision is made by law for controverting this oath, but we see no reason why it can not be controverted, and, especially if in writing, by counter affidavit made at the time when it was sought to be used as a predicate upon which to introduce the testimony of the absent witnesses. This seems to be the practice followed in the lower courts. (Ballinger v. The State, 11 Texas Ct. App., 323; Kerry v. The State, 17 Texas Ct. App., 179.) But "the oath" required by the statute is not required to be in the form of an affidavit, or even in writing. (Code Crim. Proc., Art. 772; Post v. The State, 10 Texas Ct. App., 579; Pinkney v. The State, 12 Texas Ct. App., 352; Parker v. The State, 18 Texas Ct. App., 72.) It is *an oath* made by a credible person, presumably a statement in person under the sanctity of an oath, just as any other fact is testified to by witnesses at a trial. And we can see no reason why it can not and should not be liable to be controverted and im-

peached in the same manner as any other testimony, both as to the credibility of the witness, his means of knowledge, and as to the truth of his statement. A credible person may swear to a fact and yet it may be shown that his means of knowledge was so limited that he was mistaken as to the fact. An affidavit to a fact does not *per se* mean that the affiant had personal knowledge of the fact. (U. S. v. Moore, 2 Lowell, 232; S. C. 4 Criminal Defences, 393.) The admission of this character of testimony rests solely upon necessity, and the rule as to its admission is an innovation upon the constitutional guaranty that in all criminal cases the accused shall have the right to be confronted with the witnesses against him. (Johnson v. The State, 1 Texas Ct. App., 333.) Such being the case, it is important that the facts which authorize its use be established by proof. (Menges v. The State, 21 Texas Ct. App., 413.)

We are of opinion the defendant was entitled to have the affiant Mundy called, sworn and tested as to the facts stated by him in his affidavits, and that it was error to refuse his request to that effect. It is true he filed no counter affidavit controverting Mundy's affidavit, but this was not necessary, since Mundy's "affidavit" was not in conformity to, or rather not required by, the law—the statute requiring an oath and not an affidavit.

6. Appellant's fifth and sixth bills of exception relate to errors in the charge of the court. The sixth is a special exception to the third paragraph, which is in these words, viz: " All murder committed by poison, starving, torture, or with express malice, or committed in the perpetration or in the attempt at the perpetration of arson, rape, robbery or burglary, is murder in the first degree." As charged in the indictment, the crime was a murder committed by personal injuries and with malice aforethought. There was no averment of any kind about either poison, starving or torture, nor concerning the perpetration or attempt at the perpetration of arson, rape, robbery or burglary, and there is not a scintilla of proof relating to any of these matters.

It is true that in distinguishing the two degrees of murder the code declares that either of those means, when used in its commission, constitutes murder in the first degree *per se* (Penal Code, Art. 606), but this Article is no part of the definition of murder (Neyland v. The State, 13 Texas Ct. App., 536) and is never essential to be given in the language of the statute.

On the contrary, it is worse than nonsense and folly to give any more of it than is exactly and precisely applicable to the case as laid in the indictment and made by the evidence.   To illustrate: A shoots B in a public street, with a shot gun, of his express malice, nothing more, nothing less.   Now, in the name of reason and common sense, what has arson, poison, robbery, starving, torture or rape to do with such a case?   Not one particle more than a game of pin pool, or the violation of the local option law, and perhaps not half as much.   And yet all these matters are submitted to the jury only to confuse and confound instead of enlightening them distinctly in "the law applicable to the case." (Code Crim. Proc., Art. 677.   See on this point the pertinent comments of Judge Hurt in Hackett v. The State, 13 Texas Court of Appeals, 400.)   A charge "applicable to the case" means applicable to the case as averred in the indictment and made by the evidence.   (Kouns v. The State, 3 Texas Ct. App., 13; Lister v. The State, Id. 17; Clark's Crim. Laws of Texas, 515, et seq., and note 204.)

The instruction quoted above was excepted to and a bill of exceptions reserved.   But for the fact that the patent error was cured in subsequent portions of the charge, where it was sought to apply the law to the facts, the error would have been fatal and have necessitated a reversal.   That a charge, however, is to be considered as a whole, and not by isolated paragraphs, in determining its validity and sufficiency, is the well established rule of practice in this State, and if, as a whole, it is sufficient, the demands of the law are met.   (Hart v. The State, 21 Texas Ct. App., 163.)   Where an instruction is erroneous and not afterwards cured in the charge, it will, if excepted to, be ground for reversible error without inquiry as to the probability of injury done by it.   (Niland v. The State, 19 Texas Ct. App., 166; Clanton v. The State, 20 Texas Ct. App., 615; Paulin v. The State, 21 Texas Ct. App., 436.)   There is a striking omission in the general charge.   The jury are nowhere told that if they do not believe the defendant guilty they should find him not guilty or acquit him.   A failure to so instruct might have a tendency to impress the jury with the belief that in the opinion of the court the defendant was under no circumstances entitled to be acquitted, even if they believed him not guilty.

Several requested instructions were asked by defendant and refused.   We do not believe any error was committed in this respect, the instructions not being correct in law.

After their retirement, and after they had been considering the case for some time, the jury returned into court and propounded several questions upon which they desired additional instructions from the court. These instructions the court gave in writing, and we believe that in the main they are substantially correct, and not obnoxious to the objections urged against them that they are not responsive to the questions asked or applicable to the facts in evidence.

We come now to the consideration of the motion for a new trial. Without going over or discussing any of the other grounds, we will, at the risk of prolixity, and because it is a most terrible arraignment of the fairness, justice and impartiality of the trial and proceedings in the lower court, copy in full the thirteenth ground of said motion, as we find it in the record, as follows, viz.:

"13. Because defendant did not get a fair and impartial trial, and such as is guaranteed him by the Constitution and the laws of the State of Texas, for the following reasons, to wit: From the very day that defendant was first arrested, charged with the murder of said infant, the prejudice in Clay county has been so very great, continually up to this time, against defendant, that he has been wholly unable to obtain a fair and impartial trial. That, a short time after his arrest, he was taken from the jail of Clay county by a mob of citizens of Clay county and hung in the jail yard; and that the sheriff of Clay county by force cut down said defendant just before life was extinct. That at another time, during the examining trial of defendant before Ben F. Turner, justice of the peace, in the court house of Clay county, a large number of citizens of Clay county obtained and prepared a rope with which to hang defendant out of the second story window of said court house, and which was prevented by means unknown to defendant. That the people of Clay county have continually threatened to hang this defendant, and still say that they will hang him, regardless of all law, if not hung by the law in Clay county, Texas. That said people of Clay county have organized, and did organize before the trial of this case, and agreed between themselves that if a change of venue was granted defendant in this case they would hang him before defendant left the court house; or that if this case was continued that they would hang defendant at once; or that if defendant was cleared by a jury they would then hang him before he could leave the court house.

"That at all times when this defendant was brought from the

jail of Clay county to the court house, said mob was there, ready, willing and determined to execute their said threats. That the prejudice was so great against defendant that not a man could be found who was willing to risk his life and liberty by making an affidavit for a change of venue in this case. That the district attorney himself stated to defendant's counsel, and (as defendant is informed and believes) to the court, that the prejudice against defendant in Clay county was so great that he himself would make a motion to change the venue if there was any law authorizing him so to do. *That the honorable district judge who tried this case had full knowledge of the above facts, and that the defendant's attorneys, who were appointed by the court to defend him, applied in person to the court and stated the above facts to him, and asked the court to change the venue of his own motion, as defendant could in no event obtain a fair and impartial trial in Clay county, which the court refused to do, giving no reason therefor.* That, although defendant was not ready for trial, and his attorneys had only been appointed by the court to defend him a day or two before the trial, the defendant and his attorneys were forced and compelled to announce ready for trial, and go into the trial of this case, for the reason that they well knew, and had been told by a large number of persons then present in the court house, that unless defendant did go into trial that said persons would then and there take defendant out of the charge of the officers by force and hang him until he was dead, and defendant well knew that said persons were determined to do so.

"That in obtaining a jury to try said case, about three hundred persons disqualified themselves as jurors in defendant's case on the ground that they had formed an opinion as to defendant's guilt, and that said opinion formed was against defendant. That defendant was compelled to take several jurors who were on the jury that tried this case, who were wholly disqualified by reason of having formed an opinion, for the reason that he was bound to obtain a jury and try the case or be hung by a mob. That in truth and in fact twelve men could not be found in Clay county who had not formed such an opinion as to the guilt or innocence of defendant as would influence them in finding a verdict, and that said prejudice is still so great against defendant in Clay county that the people say openly that if this case is reversed by the Court of Appeals that they will hang the defendant. That the prejudice was and is so great against de-

fendant that the court found it almost impossible to get an attorney to defend defendant in this case, and that all the attorneys at the bar refused to defend defendant and the court was compelled to require and force attorneys to defend this defendant. Defendant further says that the reason he did not file his motion for a new trial within two days after the verdict of the jury was returned, and not before this time, is because the attorneys who were appointed by the court to defend the defendant in the trial of the case positively failed and refused to make a motion for a new trial or appeal this case for defendant, although urged and requested by defendant so to do—the said attorneys giving as their reason that they had already done a large amount of work in this case, and that, if they appealed the case, they would make a large number of enemies in Clay county; and defendant says that he has been at all times and still is wholly unable to employ counsel or pay them a fee in this case. That he has no means whatever, and he has tried to get assistance from his friends but has wholly failed; and that since the verdict of the jury was rendered in this case this defendant has been without counsel to represent him or advise him until this, the fourteenth day of April, 1886, when the court appointed counsel to perfect this defendant's appeal. Wherefore defendant prays that this motion be entertained by the court, and the verdict of the jury and judgment of the court heretofore rendered in this cause be set aside and a new trial granted defendant in this case."

This motion for a new trial was subscribed and sworn to by the defendant. If but one tenth part of it be true, then there can be no question but that it should have been granted on account of error of the court in trying the case under such circumstances.

One of the statutory grounds for a new trial is where the court "has committed a material error calculated to injure the rights of the defendant." (Code Crim. Proc., Art. 777, sub. div. 2.) There is a direct charge, it will be noted, in this motion that the facts stated were known to be true by the trial judge. If the statements were not true, it would appear to have been an easy matter to deny and controvert them. It is provided by the statute that "the State may take issue with the defendant upon the truth of the causes set forth in the motion for a new trial, and in such case the judge shall hear evidence, by affidavit or otherwise, and determine the issue." (Code Crim. Proc., Art. 781.) The language is "the State *may* take issue." We will not

say that it is the duty of the State to take issue in every case where a motion for new trial is made, as, for instance, where the ordinary formal grounds only are assigned, as that "the verdict is contrary to the law and the evidence, and the court misdirected the jury as to the law," and the like; but, where the integrity and impartiality and fairness of the trial is attacked, and the same is capable of proof, it seems to us but reasonable that the State should take issue upon the causes set forth, and that in such cases, unless the facts stated are in themselves patent and against the motion, the judge should hear evidence and determine the issue upon the evidence. (Reynolds v. The State, 7 Texas Ct. App., 516; Childs v. The State, 10 Texas Ct. App., 183; Stanley v. the State, 16 Texas Ct. App., pp. 399, 400; Harris v. The State, 17 Texas Ct. App., 559; Moore v. The State, 18 Texas Ct. App., 212.)

If the facts surrounding the prisoner were such as are detailed as having taken place before the trial, and those facts were, as charged, known to the judge, and he had good reason to believe or was satisfied from said facts "that a trial alike fair and impartial to the accused and to the State" could not be had in the county, he should upon his own motion have ordered a change of venue to any county in his own or in an adjoining district, stating in his order the grounds for such change of venue. Code Crim. Proc., Art. 576; Cox v. The State, 8 Texas Ct. App., 254.) The power to change the venue of cases is by the Constitution vested in the courts, to be exercised as provided by law. (Const., Art. 3, sec. 45; Code Crim. Proc., Art. 18; Cox v. The State, 8 Texas Ct. App., 254; Webb v. The State, 9 Texas Ct. App., 490; Bohannon v. The State, 14 Texas Ct. App., 271.)

At all events if information of such facts and circumstances as are stated was brought to the knowledge of the judge by the attorneys whom he had appointed to defend, and who were officers of his court, and who stated good and sufficient reasons why defendant was unable to make the statutory motion himself, it was his duty at least to inquire into the matter and hear testimony in order that he might know what his duty was in the premises and act upon it accordingly.

And if, as stated, the district attorney knew the facts and that "on account of the lawless condition of affairs in the county a fair and impartial trial as between the accused and the State could not be safely and speedily had," "or that the life of the prisoner would be jeopardized by a trial in the county in which

the case was pending," then the statute gave him the right to move, and it was his duty to move for and try to obtain a change of venue. (Code Crim. Proc., Art. 577.)

Among English speaking peoples "the right of trial by jury" has always been considered, and Sir William Blackstone justly denominates it, "the palladium of civil rights." Our Constitution requires that it "shall remain inviolate." (Bill of Rights, sec. 15.) As an essential factor in the protection of the life and liberty of the citizen, it is considered so important that our laws declare that "the defendant to a criminal prosecution for any offense may waive any right secured to him by law except the right of trial by jury in a felony case." (Code Crim. Proc., Art. 23.) But he is not only entitled to a trial by jury, but our Constitution characterizes the kind of jury which is to try him, and says, "the accused *shall have* a speedy public trial *by an impartial jury.*" (Bill of Rights, sec. 10.) Not only so, but it is also the will and policy of the law that the "trial shall be alike fair and impartial to the accused and the State." An impartial jury and a fair trial is what the State demands, and in her demands she is no respecter of persons. She has one law for all— the high and the low, the rich and the poor, the friendless, the most debased and hardened of criminals. The greater and more horrible the crime charged the greater and more imperative the necessity that these safeguards—these landmarks of the law— should be constantly looked to and kept steadily in view, lest, perchance, they should be forgotten, denied or ignored in those natural promptings of a manly, it may be, and certainly a human instinct, which, standing appalled and outraged at the very contemplation of such heinous iniquity, condemned the suspected criminal in advance, and mainly, perhaps, through the magnitude and turpitude of his imputed crime. In such cases, when the popular mind is inflamed and popular indignation is ready and clamorous to become the executioner of its own vengeance, it is the part of an honest, fearless, manly judiciary to uphold the standard of the law, and to vindicate its majesty and integrity regardless of all consequences.

This appellant may be guilty of one of the most horrible crimes ever known in the annals of crime in this or any other country. He may justly deserve to "die the death" that has been awarded him in this proceeding. But if from the circumstances surrounding the trial which led to his conviction there is ground to believe that the same was probably not fair and impartial, and

if error prejudicial to the rights of the accused is manifest in the rulings of the court, it is the duty of this court, on appeal, to see that the conviction shall not stand, and that, if the defendant is to be hung, he be hung according to law.

For the errors we have pointed out and discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 1, 1886.